UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| CAROLE SUSAN FUQUA, ET UX | CIVIL ACTION NO. 11-cv-733 |
| VERSUS | JUDGE ELIZABETH ERNY FOOTE |
| HORSESHOE ENTERTAINMENT | MAGISTRATE JUDGE MARK HORNSBY |

### MEMORANDUM RULING

Defendant, Horseshoe Entertainment, d/b/a Horseshoe Bossier City ("Horseshoe" or "Defendant") seeks summary judgment dismissing Plaintiffs' trip and fall claim on the basis that Plaintiffs cannot prove that the Defendant knew or should have known of the alleged defect which caused Ms. Fuqua's fall. [Record Document 17]. In response, the Plaintiffs do not dispute the legal burden enunciated by Defendant, but argue that there are genuine issues of material fact as to the Defendant's actual or constructive knowledge which preclude summary judgment. For the reasons expressed below, this Court agrees with the Plaintiffs, and Defendant's Motion for Summary Judgment is **DENIED**.

### FACTS

Carole Susan Fuqua and Thomas Fuqua ("Fuquas" or "Plaintiffs") visited the Horseshoe Hotel and Casino in February 2011 while traveling back to Colorado Springs from Florida. [Record Document 17-4, pp. 143, 151, 153]. Shortly before 8 a.m. on the morning

of February 8, 2011, the Fuquas left from the front hotel entrance and walked towards their van parked in the private parking lot. The valet servicemen had roped off the private lot. Id. at pp. 175-76. There were several ways to access the valet and free parking lots. Id. at p. 175. However, the photographs and the casino surveillance recording of the accident [Record Document 19-2, Exhibit 2 and Document 17-4, Exhibit F] show that the valets blocked off most of the routes to the parking lots by stringing ropes on either side of a raised and planted median at the front of the hotel. Apparently, roping off access to the parking lot was a regular practice at the hotel as the pathway taken by the Fuquas to reach their car was well worn. To reach their car, the Fuquas crossed the planted median. Horseshoe admits that crossing the median was one of the more-frequently traveled routes that patrons and Horseshoe employees took to reach the parking lot from the front of the hotel. [Record Document 19-2, p. 195]. To cross this median patrons had "to step up onto the median from the driveway area, walk across a narrow area . . . and then step back down to the parking lot level." Id. Chris Shamburger, the casino's ground maintenance contractor, testified that the median area contains "dormant grass," whereas the casino security guard David Carty characterized the area as being "grassy." Id. at p. 242; [Record Document 17-3, p. 126]. The video and photograph referenced above show the median to be planted in small bushes except for the well-worn area which served as a pathway.

As shown on the casino video [Record Document 19-2, Exhibit A], the Fuquas stepped up onto and proceeded to walk across the median. Mr. Fuqua was carrying their bags and walking slightly to the front-right of Ms. Fuqua. [Record Document 17-4, p. 163].

Ms. Fuqua stated in her deposition that her stride was interrupted suddenly as she took a step with her left foot, causing her to lose balance. Id. at pp. 163-64]. Her right leg initially stopped her fall, but she then fell left knee first off the median curb and onto the parking lot pavement, breaking her leg. Id. at p. 164. The Fuquas testified that before, during, and immediately after the accident neither of them recall seeing any debris on or around the median that could have caused her to trip or lose her balance. Id. at pp. 154-56, 175. The video appears to show that Ms. Fuqua did not trip while stepping up onto the median or while stepping off of the median. Her trip appears to occur while she is walking on the pathway itself. The video shows no obvious cause for her fall. Mr. Shamburger, the contract ground maintenance supervisor, saw the fall from the corner of his eye while sitting at the southeast corner of the building and went to assist the Fuquas until other Horseshoe personnel arrived. [Record Document 17-3, p. 128]. Mr. Carty, the casino security guard, stated in his deposition that he checked the path where the Fuquas traversed to find a cause for the fall but found "[n]othing but grass." [Record Document 19-2, pp. 242-43]. Plaintiffs could argue that the photograph of the pathway taken after the accident [Record Document 17-4, Exhibit F] shows the existence of a rebar stub or some other protrusion in the pathway. However, the Court notes that for purposes of this motion Defendant does not dispute the existence of the rebar in the pathway.

On February 11, 2011, Mr. Fuqua and his attorney Richard Snell returned to the particular median to take pictures and saw for the first time a rebar stub protruding "about an inch to an inch and a half above" the median surface. Id. at p. 196; [Record Document

17-4, p. 175]. Two Horseshoe employees, Tameika Moore and Coby Snead, testified they first saw the exposed rebar in mid-July, 2011 when directed to the area. They described the rebar as a ½" by ½" stub protruding from the median, [Record Document 17-3, pp. 117, 120]. Mr. Carty stated that he first saw 3" to 4" of the protruding bar in the median sometime after the day of the accident but before Snead removed it in July. [Record Document 19-2, p. 250].

## LAW AND ANALYSIS

### I. Motion for Summary Judgment

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.  If the party moving for summary judgment fails to satisfy its initial burden of demonstrating the absence of a genuine issue of material fact, the motion must be denied, regardless of the nonmovant's response. Little v. Liquid Air Co., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  If the motion is properly made, however, Rule 56(c) requires the nonmovant to go

"beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted). While the nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence, all factual controversies must be resolved in favor of the nonmovant. Little, 37 F.3d at 1075; Wallace, 80 F.3d at 1047; Cooper Tire & Rubber Co. v. Farese, 423 F.3d 446, 456 (5th Cir. 2005).

## II. Liability for A Premises Defect Under Louisiana State Law

Louisiana Civil Code Articles 2317 and 2317.1 outline the circumstances under which a person may recover for injuries caused by a premises defect. Article 2317 states:

> We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.

Louisiana Civil Code Article 2317.1 states:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

Thus, to prevail in a case seeking damages for a premises defect, the Plaintiffs must demonstrate: (1) the thing was in the defendant's custody; (2) the thing contained a defect which presented an unreasonable risk of harm; (3) the defect caused the damage; (4) the Defendant knew or should have known of the unreasonable risk of harm; and (5) the damage could have been prevented by the exercise of reasonable care by the Defendant. Grogan v. Women's & Children's Hosp., Inc., 2007-1297, at 3 (La. App. 3 Cir. 4/16/08); 981 So. 2d 162, 165.

The sole issue raised by the Defendant in their motion for summary judgment is that it had no knowledge, actual or constructive, of the defect, i.e., the piece of rebar protruding in an area where both customers and employees frequently walked. In support of its summary judgment motion, Horseshoe introduced the affidavits of Tameika Moore, the casino risk and safety administrator, and Coby Snead, the facility supervisor. Ms. Moore testified that she is responsible for gathering incident reports, and that the company maintains such records for up to five years. She stated that her research of the company records, dating back to January 1, 2008, revealed no prior incident reports involving a "trip over rebar" or a "trip and fall of any kind" on the particular median. [Record Document 17-3, p. 117]. Both affiants testified they saw the rebar for the first time when directed to the location around July 15 or 16, 2011. Id. at pp. 117, 120.

The Defendant also introduced the depositions of Chris Shamburger, the contract ground maintenance supervisor mentioned above, and the Fuquas. Mr. Shamburger contracted with Horseshoe beginning in 2010 to perform ground maintenance and he and

his crew had performed regularly scheduled work on the premises up to the day of Ms. Fuqua's fall. Id. at p. 125. However, he recalled that in the month of February, his company had performed maintenance only "once or twice" on what he refers to as the "flowerbeds" on the medians, including the one where Ms. Fuqua fell. Id. at p. 126. He explained that this is because "[t]he grass [there] is dormant; there's nothing to do there." Id. Mr. Shamburger stated that he had seen photographs taken at the time the casino had opened and these revealed that in the original landscape design a tree or other large bush was located on the particular median. Id. at 135. It had been removed and replaced with a "flowerbed" before Mr. Shamburger's contract with Horseshoe had begun in 2010. Id. at p. 134. Mr. Shamburger further commented that "if the initial landscaper used rebar, it would have come from a landscape architect . . . ." Id. However, he "didn't work that area prior to th[e] fall" and did not "know why [rebar] would be in the flowerbed . . . ." Id. at pp. 134-35. Mr. Shamburger also noted that the worn nature of the current flowerbed demonstrated how frequently patrons and casino employees traversed the particular median where the accident occurred. Id. at pp. 136-37.

The Fuquas both testified that neither of them saw the exposed rebar on the day of the incident and thus were unaware as to what caused Ms. Fuqua to lose her balance or trip. [Record Document 17-4, pp. 154-55, 164, 175-76]. Mr. Fuqua first saw the rebar three days later (February 11, 2011) when he and his attorney returned to the accident site to take photographs. Id. at p. 175. After encountering the protruding stub, Mr. Fuqua assumed the rebar had tripped Ms. Fuqua. He stated that he believed the rebar tripped

Ms. Fuqua "[b]ecause there was a mark on [her] shoe" and "where the mark was on [her] shoe and the rebar would hit it, it lined up...." Id. at pp. 155-56. Judging by the photographs, Ms. Fuqua did not believe she could have seen the protruding rebar had she looked in its direction while walking over the median. Id. at p. 162. Mr. Fuqua also admitted that there were several ways to access the casino parking lots. Id. at p. 175. Neither the Fuquas nor Mr. Shamburger disputed the events as shown in Horseshoe's security video recording. Id. at p. 162.

In opposition, Plaintiffs introduced the deposition of the casino security guard David Carty. Mr. Carty has patrolled the parking lot and garage rover of the casino premises for over fourteen years. [Record Document 19-2, p. 217]. He reiterated that valet customarily roped off the valet section of the parking lot next to the "worn path over th[e] grass where everybody that parks alongside th[e] access road . . . take[s] across those curbs . . . and across th[e] little grassy knoll there going out to their vehicle." Id. at pp. 223, 242. As security protocol, on the day of the accident Mr. Carty claimed to have checked the "condition of the ground in the area where [the] accident happen[ed] to see whether anything [was] there for [Ms. Fuqua] to trip over or slip down on . . ." but found nothing. Id. at pp. 239, 242. He noted in his adopted incident report that "the area was clear of debris...." Id. at p. 244. Like Ms. Moore, Mr. Snead and Mr. Fuqua, only at some point

following the day of the incident did Mr. Carty return to the accident scene and physically see 3" to 4" of "pipe protruding from the ground." Id. at pp. 249-50.[1]

Although Horseshoe concedes that the worn nature of the median indicates that the area was frequently and heavily traversed, the casino contends that no accidents had occurred in at least the five years prior to Ms. Fuqua's fall. Thus, Horseshoe argues, it had no reason to suspect any defect existed on the particular median in question. [Record Document 17-3, p. 117]. Several Louisiana courts have addressed Horseshoe's argument and found that the lack of prior accidents is evidence of a lack of actual or constructive knowledge, although such evidence may not be dispositive of the issue. In Nicholson v. Horseshoe Entm't La. P'ship, the Second Circuit held that the plaintiff failed to show how the defendant knew or should have known of the defect in an escalator on the defendant's premises which suddenly jerked, causing the plaintiff to fall down twelve steps. 46,081, p. 1 (La. App. 2 Cir. 3/2/11); 58 So. 3d 565, 567. In its reasoning, the court emphasized that the company had received no prior complaints of the escalator jerking or other accidents occurring due to the alleged defect. Id. Although the defendant conducted only one monthly inspection of the escalator, the plaintiff failed to show that more frequent inspections either would have prevented the fall, were the industry standard, or were necessary under the specific circumstances. The Second Circuit affirmed the trial court's grant for summary judgment in favor of the defendant. Id. at 571.

---

[1] The record does not indicate the day in which he saw the rebar protruding from the ground. However, it had to have been after February 8, 2011 (because he testified that he did not see anything on the accident day) but before July 15, 2011 when Mr. Snead discovered 1/2" of exposed rebar in the median and removed it with an electrical saw. [Record Document 17-3, p. 120].

In Manchack v. Williamette Indus., Inc., the court held that "evidence of the absence of other accidents at the same place is relevant and admissible as tending to show that the place was not dangerous and that the defendant did not have actual or constructive knowledge of a dangerous condition." 93-24599 (La. App. 2 Cir. 1993); 621 So. 2d 649, 654. The court, however, stated that the lack of prior accidents was not a dispositive factor with regard to whether a defendant had actual or constructive knowledge of a defective condition in its custody. Based on other facts in the case, the Second Circuit ultimately upheld the trial court's decision to dismiss the plaintiff's claims. Id. at 655.

Defendant argues that since the rebar may have been present for a long period of time and that it must have been passed frequently by both employees and patrons without incident, Defendants had no actual or constructive knowledge of the alleged defect. The Plaintiffs argue that these same facts tend to prove that the Defendant should have known of the defect. The Plaintiffs also point to the worn condition of the median and Defendant's own admission that the area was used as a pathway as evidence that the Plaintiffs had at least constructive knowledge of the defect.

In order to resolve the issue of whether or not the Defendant had actual or constructive knowledge of the alleged defect the trier of fact will be required to weigh the credibility of the witnesses and to resolve some contradictions in the testimony. For example, if the rebar had been there for an extended period of time—at least prior to Chris Shamburger's assumption of the premises maintenance contract in 2010—why was it not discovered with regular grass and flowerbed maintenance of the median? What is the

weight to be given by the trier of fact to Mr. Carty's accident report that there was no "debris" in the area of the fall? How is this report reconciled with the photograph of the median taken a few days after the accident? Because there exist genuine issues of material fact, the Defendant has failed to carry its burden and this Court declines to grant summary judgment at this time.

**IV.**   Res Ipsa Loquitur

Although Plaintiffs have not filed their own dispositive motion, the Fuquas argue in their response to the Defendant's motion that the doctrine of res ipsa loquitur, as set out in Louisiana Civil Code Article 2317.1, should apply. Res ipsa loquitur literally translated means "the thing speaks for itself." When the criteria of the doctrine are met, an inference of liability is raised in the claimant's favor. Because this doctrine is strictly speaking a rule of evidence or burden shifting rather than a rule of substantive law, this Court will address this issue at this time despite the absence of a dispositive motion by the Plaintiffs.

Res ipsa loquitur can be applied when the following criteria are met:

> (1) [T]he injury is of the kind which does not ordinarily occur in the absence of negligence; (2) the evidence sufficiently eliminates other possible causes of the injury, such as the plaintiff's own responsibility or the responsibility of others; and (3) the alleged negligence of the defendant must fall within the scope of his duty to the plaintiff, which will often be the case if the defendant had exclusive control of the thing or situation that caused the injury to the plaintiff.

Linnear v. Centerpoint Energy Entex/Reliant Energy, 2006-3030, p. 10 (La. 9/5/07); 966 So. 2d 36, 41. This Court holds that the facts of this case do not satisfy the criterium that the

evidence sufficiently eliminate other possible causes of the injury, such as the Plaintiffs' own responsibility or the responsibility of others. Indeed, Ms. Fuqua admits that when she first fell she did not know what caused her to fall. It was only later when her husband discovered the rebar and she matched up the scrape on her shoe to the rebar that she was able to piece together how the accident happened and point to the rebar as the cause of her fall. What caused Ms. Fuqua's fall will be an issue for the trier of fact to determine and causation is not sufficiently established for the application of the res ipsa loquitur doctrine.

For the reasons enunciated above, Defendant's Motion for Summary Judgment [Record Document 17] is **DENIED**. Likewise, the Plaintiffs' Request for Application of the res ipsa loquitur doctrine, although not set out in a separate motion, is **DENIED**.

**THUS DONE AND SIGNED** in chambers, this 29th day of June, 2012, in Shreveport, Louisiana.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE